IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| SIGNATURE HOMES, LLC | * | |
| 121 Cathedral Street | | |
| Annapolis, Maryland | * | |
| | | |
| and | * | |
| | | |
| BG REALTY, LLC | * | Civil Case No.:_____ |
| 121 Cathedral Street | | |
| Annapolis, Maryland | * | |
| | | |
| Plaintiffs | * | |
| | | |
| v. | * | |
| | | |
| BRANDON P. REECE a/k/a | * | |
| BRANDON KEELY | | |
| BRANDON R. REECE | * | |
| BRANDON R. JONES | | |
| BRANDON JONES | * | |
| 1857 Chestnut Ridge Road | | |
| Grantsville, Maryland  21536 | * | |
| | | |
| and | * | |
| | | |
| BRANDY REECE a/k/a | * | |
| BRANDY JONES | | |
| 1857 Chestnut Ridge Road | | |
| Grantsville, Maryland  21536 | * | |
| | | |
| and | * | |
| | | |
| JERRY JONES | * | |
| 807 Bedford Street | | |
| Cumberland, Maryland  21502 | * | |
| | | |
| and | * | |
| | | |
| SCOTT ANGELLO | * | |
| 13420 Chatelaine Drive, N.E. | | |
| Cumberland, Maryland  21502 | * | |
| | | |
| and | * | |

ROBERT B. DOUGLAS                    *
504 Magruder Street
Cumberland, Maryland  21502          *

and                                  *

WALTER KIMBLE                        *
Route 1, Box 199C
Keyser, WV  26726                    *

and                                  *

CAMILLIA ROLLINS                     *
Arnold Stickley Road
Greenspring, West Virginia  26722    *

and                                  *

LESLIE WALKER a/k/a                  *
LES WALKER
19906 Adams Mill Road, S.W.
Frostburg, Maryland  21532           *

and                                  *

ARR REALTY, LLC                      *
16 Maple Street
Frostburg, Maryland  21532           *

Serve On:                            *
Martha L. Hyton, Esquire
218 N. Charles Street, Suite 400     *
Baltimore, Maryland  21201
                                     *
and
                                     *
EVERGREEN ASSOCIATES, LLC
1857 Chestnut Ridge Road             *
Grantsville, Maryland  21536
                                     *

Serve On:                            *
Brandon P. Reece
1857 Chestnut Ridge Road             *
Grantsville, Maryland  21536

           *

and

           *

WESTERN MARYLAND
CONSTRUCTION SOLUTIONS, LLC   *
16 Maple Street
Frostburg, Maryland  21532   *


Serve On:   *
Jason C. Buckel
213 Washington Street   *
Cumberland, Maryland  21502
         *

and
         *

JONES QUALITYCONTRACTING
P.O. Box 222
Frostburg, Maryland 21532   *


Serve On:
BRANDY REECE   *
1857 Chestnut Ridge Road
Grantsville, Maryland  21536   *


and   *

CUSTOM BRICK LAYERS & BUILDERS *
827 Iron Rail Court
Woodbine, Maryland  21797   *


Serve On:   *
JERRY JONES
827 Iron Rail Court   *
Woodbine, Maryland  21797
         *

and

```
                                        *
WALKER & SON
19906 Adams Mill Road, S.W.              *
Frostburg, Maryland  21532
                                        *

Serve On:                               *
Leslie Walker
19906 Adams Mill Road, S.W.              *
Frostburg, Maryland  21532
                                        *

     Defendants
*    *    *    *    *    *    *    *    *    *    *    *
```

# COMPLAINT

Now Come Plaintiffs Signature Homes, LLC and BG Realty, LLC ("Plaintiffs") by and through their attorneys, Andrew Radding, H. Scott Jones, and Adelberg, Rudow, Dorf & Hendler, LLC and file this Complaint and states:

## I. NATURE OF THE ACTION

1.      This action is in part a shareholder derivative action brought for the benefit of nominal Plaintiff Signature Homes, LLC, against a managing member,  ARR Realty, LLC, and its associated individuals, family members, employees, vendors and suppliers who all conspired and siphoned funds through a variety of fraudulent schemes from Signature Homes, LLC.

2.      Plaintiff BG Realty, LLC is also bringing this action in its own capacity as a member of Signature Homes, LLC.

## II.  THE PARTIES

3.      Nominal Plaintiff Signature Homes, LLC ("Signature Homes") is a Maryland limited liability company with its principal place of business located at 121 Cathedral Street, Annapolis, Maryland.

4.      Plaintiff BG Realty, LLC ("BG Realty") is a Maryland limited liability company with its principal place of business at 121 Cathedral Street, Annapolis, Maryland 21401.

5.      Defendant Brandon P. Reece AKA Brandon Keely, Brandon R. Reece, Brandon R. Jones, Brandon Jones ("Mr. Reece") is an individual who resides at 1857 Chestnut Ridge Road, Grantsville, Maryland 21536.

6.      Defendant Brandy Reece ("Mrs. Reece") is an individual who resides at 1857 Chestnut Ridge Road, Grantsville, Maryland 21536.  She is married to Mr. Reece.

7.      Defendant Jerry Jones ("Mr. J. Jones") is an individual who resides at  807 Bedford Street, Cumberland, Maryland 21502.  Mr. Jones is Mrs. Reece's father.

8.      Mr. Reece, Mrs. Reece, and Mr. J. Jones hereinafter shall be collectively referred to as the "Reece Family."

9.      Defendant Scott Angello ("Angello") is an individual who resides at 13420 Chatelaine Dr. NE, Cumberland, Maryland 21502.

10.     Defendant Robert B. Douglas ("Douglas") is an individual who resides at 504 Magruder Street, Cumberland, Maryland 21502.

11.     Defendant Walter Kimble ("Kimble") is an individual who resides at Route 1 Box 199C, Keyser, WV 26726.

12.     Defendant Camillia Rollins ("Rollins") is an individual who resides at Arnold Stickley Road, Greenspring, WV 26722.

13.     Defendants Angello, Douglas, Kimble and Rollins hereinafter shall be collectively referred to as the "Disloyal Employees."

14.     Defendant Leslie Walker ("Walker") is an individual who resides at  19906 Adams Mill Rd SW, Frostburg, Maryland 21532.

15.     Defendant ARR Realty, LLC ("ARR") is a Maryland limited liability company with its principal place of business located at 16 Maple Street, Frostburg, Maryland 21532.

ARR is a Managing Member of Signature Homes.  Mr. Reece is the sole and managing member of ARR.

16.     Defendant Evergreen Associates, LLC is a Maryland limited liability company with its principal place of business located at 1857 Chestnut Ridge Road, Grantsville, Maryland 21536 (hereinafter "Evergreen").  Evergreen is owned by Mr. and Mrs. Reece.

17.     Defendant Western Maryland Construction Solutions, LLC is a Maryland limited liability company with its principal place of business located at 16 Maple Street, Frostburg, Maryland 21532 (hereinafter "Western Maryland Construction Solutions").  Western Maryland Construction Solutions is owned in whole or in part by Mr. and Mrs. Reece.

18.     Defendant Jones Quality Contracting, is an unincorporated Maryland association with its principal place of business located in Frostburg, Maryland  and is owned in whole or in part by members of the Reece Family.

19.     Defendant Custom Brick Layers & Builders, is an unincorporated Maryland association with its principal place of business located at 827 Iron Rail Court, Woodbine, Maryland 21797 and is owned in whole or in part by members of the Reece Family.

20.     ARR, Evergreen, Western Maryland Construction Solutions, Jones Quality Construction,  Custom Brick Layers & Builders are hereafter collectively referred to as the "Reece Affiliated Entities."

21.     Defendant Walker & Son is an unincorporated Maryland association with its principal place of business located 19906 Adams Mill Rd SW, Frostburg, Maryland 21532 and is owned in whole or in part by Defendant Walker.

22.     Defendants Walker and Walker & Son are hereafter collectively referred to as the "Walkers."

## III.  JURISDICTION AND VENUE

23.     This Court has personal jurisdiction over Defendants because Defendants are residents of Maryland, have a principal place of business in Maryland and/or the events or omissions giving rise to the claim against them occurred within Maryland.

24.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and 18 U.S.C. §1964(c) as this case includes claims under the Racketeer Influenced and Corrupt Organizations Act. The Court has jurisdiction over the remaining claims pursuant to its supplemental jurisdiction conferred by 28 U.S.C. §1367(a).

25.     Venue is proper in this jurisdiction pursuant to 28 U.S.C. § 1391(b) insofar as a substantial part of the events or omissions giving rise to the claim occurred within this judicial district.  Furthermore, venue is proper under the provision of the 18 U.S.C. §1965, by virtue of certain of the Defendants' location, through their racketeering activity, within said district, and to further the ends of justice.

## IV.  DERIVATIVE AND DEMAND EXCUSED ALLEGATIONS

26.     BG Realty also brings this action derivatively in the right and for the benefit of Signature Homes to redress injuries suffered and to be suffered by Signature Homes as a result of the breaches of fiduciary duty and other violations of law by the  Defendants.

27.     BG Realty will adequately and fairly represent the interests of the Company and its shareholders in enforcing and prosecuting its rights, and has retained counsel experienced in litigating complex commercial and civil actions.

28.     As a result of the facts set forth herein, BG Realty has not made any demand on ARR  as a Managing Member of Signature Homes or Mr. Reece to institute this action. Signature Homes' Operating Agreement vests management exclusively in the Managing

Member (being both BG Realty and ARR). Any such demand would be a futile and useless act because ARR and Mr. Reece are incapable of making an independent and disinterested decision to institute and vigorously prosecute this action against themselves and other relatives and associates.  As more fully set forth below, Mr. Reece, by and through ARR, and in cooperation with the Reece Family, Reece Affiliated Entities, Disloyal Employees and certain vendors and suppliers engaged in various schemes to defraud Signature Homes.

## V.  FACTS COMMON TO ALL COUNTS

### A.  Prichard Farms Development Project

29.     Kevin Bell (hereinafter "Mr. Bell") is an individual engaged in the real estate development business.  He is the owner of Kevin V. Bell, LLC which is the owner of  BG Realty.   Mr. Bell has been involved in a number of real estate developments in the Cumberland/Allegany County region.   These projects include a single-family residential development on the property formerly known as the Prichard Farms adjacent to Frostburg in Allegany County, Maryland.

30.     Mr. Reece has been involved in the construction of residential developments, rental properties and homes in the Allegany County region through the entity known as Evergreen.  Mr. Reece has, in the past, constructed and managed student apartments in the Frostburg area through Evergreen.

31.     On or about August 12, 2004, Mr. Bell and Mr. Reece agreed to jointly develop Prichard Farms.  A business plan for the development of the Prichard Farms project was agreed to wherein Mr. Bell, through his affiliated entities, would provide financial and accounting services without profit to the project.    Mr. Reece, through his existing affiliated entities, would construct  the  infrastructure  and  also  engage  in  custom  home  building  activity  within  the

Prichard Farms Development.  Mr. Reece would be responsible for the accounting records for the  entities performing the construction services.  Mr. Bell and Mr. Reece agreed that these construction services would be provided at "cost plus overhead reimbursement."  Any profits to be earned from the Prichard Farms Development would be separately distributed to Mr. Bell and Mr. Reece.

### B.  The Creation of Frostburg Associates, LLC

32.    In order to implement the Prichard Farms Business Plan, Mr. Bell and Mr. Reece formed Frostburg Associates, LLC ("Frostburg") to act as the developer of the Prichard Farms Project.  Mr. Bell owned 47% of Frostburg Associates through his ownership of BG Realty. Mr. Reece owned 33% of Frostburg through his ownership of BPR Realty, LLC.  In addition, Matthew Brewer owned 20% interest through his ownership of Mountain Venture, LLC. Articles of Organization were filed with the State Department of Assessments & Taxation of the State of Maryland on August 12, 2004.  The parties executed an Operating Agreement dated August 19, 2004 for Frostburg.

33.    Section 3.5 of the Frostburg Operating Agreement specifically provided the following:

> Members providing management services shall not receive any compensation without the prior written approval of all members, except that the Managing Member shall be entitled to charge the company for services rendered in connection with developing and marketing the property and keeping and maintaining the records for the company.

Pursuant to Section 3.1.1, the Managing Member of Frostburg was BG Realty.

34.    The agreement reached between Mr. Bell and Mr. Reece was that the construction services to be provided by Mr. Reece would be provided by Evergreen.  Mr. Reece agreed not to take any profit or draw any salary for the Prichard Farms construction.  Rather, Mr. Bell and Mr.

Reece agreed that their profit from the Prichard Farms project would be distributed in the later stages of the project after it was well underway and successfully established.  Those profits would be distributed by and through Frostburg.

### C.  Creation of Signature Homes, LLC

35.     In early 2005, Mr. Reece separated his activities involving the Prichard Farms project from his other activities at Evergreen.  Mr. Reece caused to be created an entity known as Signature Homes, LLC through an affiliated company known as BPR Realty, LLC.  Mr. Reece is the managing member of BPR Realty, LLC.  On October 6, 2004 Articles of Organization for Signature Homes, LLC were filed with the State Department of Assessments & Taxation for the State of Maryland.  Signature Homes was formed "to engage in business in the State of Maryland, including but not limited to, residential and commercial construction and contracting."

36.     Mr. Bell and Mr. Reece subsequently agreed that Mr. Bell through BG Realty would become an equal interest member in Signature Homes with Mr. Reece.  Accordingly, the parties entered into the First Amended and Restated Operating Agreement dated June 22, 2005 whereby BG Realty was admitted as a member of Signature Homes and the parties, thereafter, owned Signature Homes with each having a 50% interest.

37.     The First Amended and Restated Operating Agreement was subsequently amended on September 22, 2005 and BPR Realty, LLC, withdrew from Signature Homes and ARR, whose Managing Member is Brandon Reece, was admitted.  In addition, the parties admitted JMR Associates, LLC as a member of Signature Homes.  JMR Associates, LLC is a Maryland limited liability company whose sole member is James M. Riggs.  As a result of that

transaction, BG Realty held a 47-1/2% interest in Signature Homes, ARR Realty held a 47-1/2% interest in Signature Homes and JMR Associates, LLC held a 5% interest.

38.     The First Amended and Restated Operating Agreement defines "Managing Member" as BG Realty and ARR (substituted pursuant to the withdrawal of BPR Realty, LLC) states that "[b]oth BG and [ARR] shall have the authority to act as Managing Member."

39.     By reason of its position as Managing Member, and membership in Signature Homes, ARR and its managing member Mr. Reece had the ability to control the business and company affairs of Signature Homes and owes to Signature Homes and its other members the fiduciary obligations of good faith, trust, loyalty, and due care, and are required to use their utmost ability to control and manage Signature Homes in a fair, just, honest, and equitable manner.  Mr. Reece and ARR are required to act in furtherance of the best interest of Signature Homes and its other members so as to benefit all members equally and not in furtherance of their personal interest or benefit.  A managing member owes a fiduciary duty to Signature Homes to exercise good faith and diligence in the administration of the affairs of Signature Homes in the use and preservation of its property and assets, and the highest obligation of fair dealing.

40.     To discharge these fiduciary duties, Mr. Reece and ARR were required to exercise reasonable and prudent supervision over the management, policies, practices, operation and controls of Signature Homes to ensure that the affairs of the company were conducted in an efficient businesslike manner so as to make it possible to provide the highest achievable quality of performance and profitable return.

### D.  Allegany Station & Residences at The Club Development Projects

41.     After becoming partners, through various affiliated entities, in the Prichard Farms Development, Mr. Bell and Mr. Reece partnered to do two additional developments.  The first was Allegany Station, a 33-unit townhouse development on Decatur Street in Cumberland, Maryland.  The second was the Residences at The Club, a planned development at the Cumberland Country Club.

42.     Mr. Bell and Mr. Reece agreed to use Signature Homes as the general contractor for Allegany Station and Residences at The Club, in addition to Prichard Farm.  The Agreement was that Signature Homes would render services at cost plus overhead with profits flowing up and ultimately distributed through the  respective development companies.

43.     This Agreement was documented in Section 3.7 of the First Amended and Restated Operating Agreement for Signature Homes, LLC which provides:

> Nothing in this Agreement shall be deemed to restrict in any way the rights of any Member, or any affiliated persons of any Member, to conduct any business or activity; provided, however, that it is the intent of the Members  that the Company shall provide construction services to affiliates of the Members at cost including overhead. Each Member acknowledges that each other Member or their affiliated persons may be interested, directly or indirectly in the various businesses and undertakings not including the Company. (emphasis added)

44.     As a result of the creation of Frostburg and Signature Homes, Mr. Bell and Mr. Reece had put in place the entities to carry through their business plan for the developments. Mr. Bell, through his affiliated entities would provide financial and accounting services for Frostburg, Decatur Street Associates, LLC and Residences at The Club, LLC  without profit, but would be paid for his overhead.  Signature Homes would provide the construction related activities for the Prichard Farms infrastructure and construction of custom homes without profit,

but would be entitled to be paid overhead.  Signature Homes, under the direction of Mr. Reece, would be responsible for the preparation of its accounting records.  The parties would profit from the success of the projects through their respective ownership interest in Frostburg, Decatur Street Associates, LLC and Residences at The Club, LLC only upon success of the underlying projects.

45.     At all times relevant to this Complaint, Mr. Reece managed and controlled all the day to day operations of Signature Homes.  Mr. Bell, and his affiliated entities, maintained no operational control of Signature Homes and only received sporadic progress reports and financial information.

**E.  Defendants' Schemes To Defraud Signature Homes**

46.     Mr. Reece and ARR abused their positions of control and authority over Signature Homes and exercised control over the wrongful acts specifically set forth in this Complaint.

47.     Mr. Reece and ARR devised schemes with the other members of the Reece Family and Reece Affiliated Entities to embezzle and defraud Signature Homes and its other members by using various fraudulent means to siphon funds from Signature Homes to the Reece Family and Reece Affiliated Entities.

48.     Mr. Reece, other members of the Reece Family and Reece Affiliated Entities recruited various employees of Signature Homes to participate in the schemes to defraud Signature Homes.  The Signature Homes employees included: (1) Defendant Angello who held the job title of Project Manager and was employed from July 21, 2005 to on or about November 10, 2006; (2) Defendant Douglas who held the job title of Director of Operations and was employed from July 5, 2005 to December 8, 2006; (3) Defendant Kimble who held the job title of Project Manager and was employed from October 20, 2005 to November 10, 2006; and (4)

Defendant Rollins who held the job title of Bookkeeper and was employed from November 22, 2005 to on or about November 10, 2006 .  The Disloyal Employees furthered and concealed the various fraudulent schemes committed by Mr. Reece and other Defendants by not reporting the fraud, preparing false transaction/accounting records and destroying documents. The Disloyal Employees were compensated by Signature Homes and, it is believed and therefore averred, from the fraudulently obtained proceeds for their participation in these schemes.  The specific participation in the various fraudulent schemes by the Disloyal Employees is set forth below.

49.     As managing member and employees of Signature Homes, ARR, Mr. Reece and the Disloyal Employees  were required to perform and exercise their duties in good faith and with loyalty, in a manner to be in the best interest and benefit of Signature Homes and with the care that ordinary, prudent people in like positions would use under similar circumstances, without any self-interest or self-dealing.

50.     Mr. Reece, ARR and the Disloyal Employees breached their fiduciary duties owed to Signature Homes by their intentional, malicious and fraudulent actions, including but not limited to, embezzling  assets of Signature Homes to their own use and intentionally causing financial harm to Signature Homes through concealment and non-disclosure of corporate transactions, wrongfully diverting corporate opportunities to their own benefit, and entering into fraudulent related party transactions.

51.     Mr. Reece, ARR, and the Disloyal Employees breached their fiduciary duties owed to Signature Homes by their intentional, malicious concealment of the substandard workmanship being performed by Signature Homes, and other contractors, on its construction projects and custom home projects, i.e. the Briner custom home project in West Virginia.

52.     Mr. Reece, ARR other members of the Reece Family, Reece Affiliated Entities, and the Disloyal Employees, recruited outside vendors and contractors to participate in the schemes to defraud Signature Homes.   These outside vendors and contractors included; (1) Defendant Walker and (2) Defendant Walker & Son (collectively, "Walkers").   The Walkers were compensated by Signature Homes through the various fraudulent schemes detailed below and, it is believed and therefore averred, a portion of these fraudulently obtained proceeds were returned to the Reece Family, Reece Affiliated Entities, and the Disloyal Employees.

53.     As specifically set forth below, Defendants conspired and used the following methods to embezzle and defraud funds and assets from Signature Homes, including: unsubstantiated direct payments, the generation and payment of fraudulently inflated invoices, the generation and payment of fraudulent invoices for work that was either not performed, performed by others or performed below standard, the use of equipment and resources for personal benefit without reimbursement, and the creation and payment of fraudulent liabilities.

54.     As part of Defendants' fraudulent schemes, Defendants knew that mails and wire would be used to transmit fraudulent invoices to Signature Homes and cause payments thereon to be tendered through the use of mails and wire.   In particular, these communications would fraudulently mislead Signature Homes into believing that the work was properly performed at a fair and reasonable price.

55.     As part of Defendants' fraudulent schemes, Defendants knew that mails and wire would be used to transmit financial and construction status information to BG Realty, Mr. Bell and various financial institutions that contained fraudulent and misleading information.   In particular, these periodic financial reports would mislead the Plaintiffs and financial institutions

into believing that the fraudulent payments for labor, equipment and material to the Defendants were valid business expenses of Signature Homes.

56.     As part of Defendants' fraudulent schemes, Defendants knew and caused mails and wire to be used to order interstate labor, materials and equipment purportedly for the benefit of Signature Homes but, which were in actuality, diverted for the personal use of the Reece Family.  Defendant Reece would then cause Signature Homes to pay for this diverted labor, materials and equipment through the use of mails and wire in furtherance of the scheme to defraud.

57.     Defendants could reasonably foresee that their fraudulent actions would result in the use of the mails and/or wire in furthering their fraudulent transactions.

58.     Defendants could reasonably foresee that their fraudulent actions would result in financial institutions being provided the fraudulent disclosures and reports.

59.     Defendants could reasonably foresee that the financial institutions would rely on the those fraudulent disclosures and reports.

60.     Defendants could reasonably foresee that their fraudulent actions would result in other businesses being provided fraudulent disclosures.

**F.  Fraudulent Payments Directly To Mr. Reece**

61.     From the period December 15, 2004 through October 19, 2006, Signature Homes made $285,504 in payments to Mr. Reece.

62.     Prior to BG Realty becoming a member of Signature Homes, from December 15, 2004 to June 20, 2005, Mr. Reece was paid a total of $39,126 from Signature Homes' funds without any invoice backup or proper explanation of the purpose of these payments.

63.    After BG Realty became a member of Signature Homes, from July 1, 2005 to October 19, 2006, Mr. Reece and the Disloyal Employees caused Signature Homes to make approximately 38 payments totaling $174,829 to Mr. Reece.  Except for four (4) checks totaling $1,137.02,  there are  $173,691.54 of payments to Mr. Reece without any invoice backup or proper explanation of the purpose of these payments.

64.    From April 25, 2005 through September 12, 2006, Mr. Reece, ARR and the Disloyal Employees caused Signature Homes to make four (4) payments to Capital One totaling $7,974.21 on behalf of Mr. Reece without any invoice backup or proper explanation of the purpose of these payments.

65.    On July 28, 2005, Mr. Reece, ARR and the Disloyal Employees caused Signature Homes to make a payment to FSUF/Bobcat Club for $1,000 without any invoice backup or proper explanation of the purpose of these payments.

66.    Mr. Reece, ARR and the Disloyal Employees caused Signature Homes to pay for $15,243 of additional and   unauthorized benefit payments to or an behalf of himself and/or family.

67.    On December 23, 2005, Mr. Reece took $12,025.85 from a Signature Homes' Escrow Account at Hoblitzell National Bank without any invoice backup or proper explanation of the purpose of this withdrawal.

68.    Mr. Reece, ARR and the Disloyal Employees carried out the fraudulent loan repayment scheme by means of mail\wire in interstate commerce for the purpose of executing such scheme or artifice.

69.    The transfers, withdrawals and payments to and on behalf of Mr. Reece*, supra*, were made with the specific intent to defraud the Plaintiffs.  These schemes constitute a scheme

or artifice to defraud or for obtaining money or property by means of false or fraudulent pretenses, representations or promises.

### G. Fraudulent Loan Repayment To Mr. Reece

70.     On or about July, 2005, Mr. Reece, ARR and the Disloyal Employees caused Signature Homes to send an invoice to the Residences at the Country Club for $50,000.00 for "mobilization of the project at the Country Club per contact."  This invoice does not appear to be generated by Signature Homes' accounting system.

71.     On July 26, 2005, Signature Homes received and deposited $50,000 from Residences at the Club, LLC for this invoice.  This deposit was not recorded in Signature Homes' books as revenue for Signature Homes but as a loan from Mr. Reece.

72.     On August 26, 2006, Mr. Reece, ARR and the Disloyal Employees caused Signature Homes to issue a check to Mr. Reece for $50,000 in repayment of this fraudulent "loan."

73.     During the period September 2005 to November 2006, Mr. Bell and BG Realty attempted to review, understand and compile accurate accounting records for Signature Homes. During this process Mr. Reece, ARR and the Disloyal Employees explicitly misled Mr. Bell and BG Realty as to the true nature of this transaction in conversations both in person, through electronic mail and over the telephone.

74.     The fraudulent loan repayment to Mr. Reece, *supra*, was made with the specific intent to defraud the Plaintiffs.  The scheme constitutes a scheme or artifice to defraud or for obtaining money or property by means of false or fraudulent pretenses, representations or promises.

75.     Mr. Reece, ARR and the Disloyal Employees carried out the fraudulent loan repayment scheme by means of mail\wire in interstate commerce for the purpose of executing such scheme or artifice.

### H.  Fraudulent Equipment Conversions, Transfers And Sales of Signature Homes' Vehicles

76.     Mr. Reece, ARR, Disloyal Employees and the Reece Affiliated Entities have unlawfully taken possession of virtually all of Signature's equipment, tools and plans.

77.     Mr. Reece, ARR, Disloyal Employees, and the Reece Affiliated Entities have wrongfully taken possession of approximating $1,561,755 of Signature Homes' vehicles and equipment as set forth on *Exhibit 1*.

78.     Signature Homes owned certain vehicles which were purchased or acquired by Signature Homes and insured by Signature Homes.  Subsequent to Mr. Reece's departure from Signature Homes, Mr. Reece has retained possession of these vehicles.  Western Maryland Construction Solutions has added some of these vehicles to its insurance policy.  Mr. Bell, through his affiliated entities, continues to pay the vehicle insurance on some of these vehicles even though they are not in Signature Homes' possession.

79.     On or about November 29, 2006, Mr. Reece changed the name of the owner of Signature Homes' 2005 Chevy Silverado VIN # 1GCHK23285F938418 from Signature Homes to himself ("Brandon P. Reece").  On the MVA change of address and/or name form Mr. Reece falsely represents that he is the "sole owner" of Signature Homes.  Mr. Reece did not make any payment to Signature Homes for this change in ownership of its vehicle.

80.     On or about March 12, 2007, Mr. Reece sold Signature Homes' 2004 Chevy Express Truck VIN # 1GBJG314341190545 to Evergreen for no consideration.  On the MVA

Bill of Sale, Mr. Reece used the name "Brandon R. Reece."  Mrs. Reece signed on behalf of Evergreen. Hoblitzell National Bank approved of this sale without any notice to Signature Homes.  Neither Mr. Reece nor Evergreen made any payment to Signature Homes for this purchase of its equipment.

81.     On or about March 12, 2007, Mr. Reece sold Signature Homes' 2005 Ford F350 Truck VIN # 1FDWX37P25EA20332 to Evergreen for no consideration.  Hoblitzell National Bank approved of this sale without any notice to Signature Homes.  Neither Mr. Reece nor Evergreen made any payment to Signature Homes for this purchase of its equipment.

82.     On or about April 4, 2007, Mr. Reece sold Signature Homes' 2005 Chevy Silverado VIN # 1GBJK395E241400 to Evergreen for no consideration.  Neither Mr. Reece nor Evergreen made any payment to Signature Homes for this purchase of its equipment.

83.     On or about March 14, 2007, Mr. Reece sold Signature Homes' GMC 2003 4500 Series Truck VIN # 1GDE4E1153F06693 to Braddock Construction, LLC for $21,000. Hoblitzell National Bank approved of this sale without any notice to Signature Homes and the existing promissory note on the vehicles was paid off on March 15, 2007.  Mr. Reece entered into this transaction without any notice to Signature Homes.  Upon information and belief the actual fair market value and/or actual proceeds from the sale exceeded $21,000.

84.     The above equipment conversions, transfers and sales to related and/or third parties were made with the specific intent to defraud the Plaintiffs.  The above scheme constitutes a scheme or artifice to defraud or for obtaining money or property by means of false or fraudulent pretenses, representations or promises.

85.     Mr. Reece, ARR and the Disloyal Employees carried out the conversions, transfers and sales to related and/or third parties by means of mail\wire in interstate commerce for the purpose of executing such scheme or artifice.

**I.   Fraudulent Payments To Evergreen**

86.      From December 28, 2004 through October 18, 2006, Mr. Reece, ARR and the Disloyal Employees caused Signature Homes to make payments to Evergreen totaling $157,319.12 without any invoice backup or proper explanation of the purpose of these payments.

87.     On February 22, 2005, Mr. Reece, Mrs. Reece, ARR and the Disloyal Employees caused Signature Homes to borrow $231,451 from Hoblitzell National Bank ("HNB").  On or about, May 2, 2005, HNB transferred $49,000 to Signature Homes that was being held pending collateral identification.  Mr. Reece, ARR and the Disloyal Employees caused the $49,000 loan proceeds to be falsely recorded in Signature Homes' books as a deposit from Evergreen. Thereafter, on or about May 3, 2005, $21,510 was transferred to Evergreen.

88.     Mr. Reece, ARR and the Disloyal Employees caused Signature Homes to make payments to Evergreen totaling $15,627 pursuant to an alleged storage lease.  It is believed and therefore averred, that Signature Homes was provided no real benefit under the alleged storage lease and that the "lease" was a sham.

89.     During the period from December 2004 through December 2006, Mr. Reece, ARR and the Disloyal Employees caused Signature Homes to make payments totaling $4,447 on behalf of Evergreen without reimbursement.

90.     Upon information and belief, Mr. Reece utilized PO Box #222 to divert invoices from certain vendors, i.e. 84 Lumber, for Signature Homes and the Reece Affiliated Entities to a

separate mailbox.   Mr. and Mrs. Reece would conceal/destroy certain vendor invoices for material ordered for personal use and for the use of the Reece Affiliated Entities.   Mr. Reece, ARR and the Disloyal Employees caused Signature Homes to pay these vendors without the invoice backup for material used for personal use by Mr. and Mrs. Reece and by the Reece Affiliated Entities.   Mr. Reece also used the alias "Brandon Keely" with PO Box #222.

91.     Mr. Reece, ARR and the Disloyal Employees carried out these fraudulent transfers to and on behalf of Evergreen by means of mail\wire in interstate commerce for the purpose of executing such scheme or artifice.

92.     The above transfers, withdrawals and payments to and on behalf of Evergreen were made with the specific intent to defraud the Plaintiffs.   These above schemes constitute a scheme or artifice to defraud or for obtaining money or property by means of false or fraudulent pretenses, representations or promises.

**J.  Fraudulent Equipment Sale/Lease To Signature Homes**

93.     On July 26, 2005, Mr. Reece, ARR and the Disloyal Employees caused Signature Homes to purchase and lease equipment from Mr. Reece and/or Evergreen.   Mr. Reece prepared and presented a list of equipment to be acquired by Signature Homes and represented that this equipment had a present fair market value of $1,129,679 with a collective $454,000 of associated outstanding liabilities.   Mr. Reece and Evergreen would therefore be transferring $675,679 of equity in the equipment to Signature Homes as of the transaction date.

94.     The $1,129,679 of equipment to be transferred to Signature Homes was be divided into two groups.   One group of equipment with a total fair market value of $680,379 equipment would be sold to Signature Homes.   The second group of equipment with a total fair

market value of $449,300 would be leased by Signature Homes with the title to the equipment passing to Signature Homes at the completion of the lease term.

95.     The first group of equipment purportedly transferred to Signature Homes is set forth on *Exhibit 2* and allegedly had a present fair market value of $680,379.00 and associated outstanding liabilities of $272,000. Mr. Reece and Evergreen allegedly transferred the equipment set forth on *Exhibit 2* in consideration for Signature Homes executing a $350,000 promissory note. As detailed on *Exhibits 2 and 3*, this sale transaction was a fraud upon Signature Homes.

96.     As set forth on *Exhibit* 2, $370,116 of the equipment purportedly sold to Signature Homes had been previously purchased by Signature Homes. Mr. Reece, ARR and the Disloyal Employees intentionally misrepresented to Signature Homes, BG Realty, and Mr. Bell that Mr. Reece and/or Evergreen was the owner of this $370,116 of equipment. Mr. Reece, ARR and the Disloyal Employees caused Signature Homes to purchase $370,116 of equipment that Signature Homes already owned.

97.     As set forth on *Exhibit* 2, $290,963 of the equipment purportedly sold to Signature Homes has never been located or identified. Mr. Reece, ARR and the Disloyal Employees intentionally misrepresented to Signature Homes, BG Realty, and Mr. Bell that Mr. Reece and/or Evergreen was the owner of this $290,963 of equipment and that this equipment actually existed. Mr. Reece, ARR and the Disloyal Employees caused Signature Homes to purchase $290,963 of equipment that upon information and belief never existed. Mr. Reece, ARR and the Disloyal Employees could not provide serial numbers, transaction documents, titles, or any other form of evidence of ownership during the subsequent investigation of this transaction by Mr. Bell and BG Realty.

98.     In addition to selling assets to Signature Homes that Signature Homes had already purchased, as shown on *Exhibit 3*,  Mr. Reece, ARR and the Disloyal Employees intentionally misrepresented the fair market value and/or understated outstanding liabilities  on the equipment allegedly sold to Signature Homes by a total of $74,857.33.The second group of  equipment purportedly transferred to Signature Homes through a capital lease with Evergreen is set forth on *Exhibit 4* and allegedly had a present fair market value of $449,300, associated outstanding liabilities of $182,000 and therefore equity of $267,300.  As shown on *Exhibit 4*,  Mr. Reece, ARR and the Disloyal Employees intentionally misrepresented the fair market value and/or understated outstanding liabilities on the equipment allegedly sold to Signature Homes by a total of $205,373.   Additionally, upon information and belief, a 2000 Caterpillar 312B Excavator valued at $75,000 with associated outstanding liability of $8,000 never existed.

99.     During the period September 2005 to November 2006, Mr. Bell and BG Realty attempted to review, understand and compile accurate accounting records for Signature Homes. During this process Mr. Reece, ARR and the Disloyal Employees explicitly misled Mr. Bell and BG Realty as to the true nature of these transaction in conversations both in person and over the telephone.

100.     Mr. Reece, ARR and the Disloyal Employees alleged that assorted hand and power tools with an approximate value of $203,063 were included with the equipment being purchased.  Signature Homes cannot locate the alleged $203,063 of power tools and does not believe they were ever transferred to Signature Homes.   Upon information and belief these small hand and power tools never existed at all.  During the tax preparation process for the 2005 income tax return, Mr. Reece, ARR and the Disloyal Employees explicitly misled Mr. Bell and

BG Realty to account for these small tools with a cost basis of $295,800 in order to account for the transaction.

101.    Mr. Reece, ARR and the Disloyal Employees carried out this fraudulent sale/lease transaction by means of mail\wire in interstate commerce for the purpose of executing such scheme or artifice.

102.    The above fraudulent equipment sale/lease and subsequent conversion of the equipment were made with the specific intent to defraud the Plaintiffs.   The above scheme constitutes a scheme or artifice to defraud or for obtaining money or property by means of false or fraudulent pretenses, representations or promises.

103.    Mr. Reece, ARR the Reece Family, Reece Affiliated Entities and the Disloyal Employees have wrongfully taken virtually all existing equipment pursuant to this sale and lease transaction.

**K. Mr. Reece And Evergreen Wrongfully Converted And Repossessed Signature Homes' Equipment**

104.    Mr. Reece advised Mr. Bell that Mr. Reece was retaining equipment purportedly sold to Signature Homes as a result of an alleged breach of the $350,000 promissory note.   As set forth above, Mr. Reece, ARR and the Disloyal Employees intentionally misrepresented the fair market value of the equipment being purchased with the $350,000 promissory note. Equipment with a purported fair market value of $370,000 was already owned by Signature Homes and equipment with a purported value of $290,963 has never been located or identified. Additionally, Mr. Reece, Evergreen, ARR and the Disloyal Employees overstated the fair market value and understated the outstanding liabilities for this equipment by a net total of $74,857.33.

105.    The entire $350,000 promissory note transaction was a fraud upon Signature Homes. Mr. Reece and Evergreen have retained all of the existing equipment which he and Evergreen purportedly conveyed to Signature Homes with the vast majority of the equipment already having been previously purchased by Signature Homes.

106.    Mr. Reece and  ARR arranged a series of Equipment Finance Lease Agreements with Evergreen.  There were ultimately five such Equipment Finance Leases between Evergreen and Signature Homes.  As set forth above, much of this equipment was fraudulently leased by Signature Homes because Mr. Reece, ARR and the Disloyal Employees intentionally misrepresented $272,373 in overstated fair market value and understated outstanding liability to Signature Homes.

107.    Subsequent to Mr. Reece's departure from Signature Homes, Mr. Reece and/or Evergreen retained all of the existing leased equipment for their own use and denied any use to Signature Homes.  Each of the equipment leases specifically provides for remedies in the event of a default for non-payment.  That remedy is the following:

> In the event that the Lessor repossesses the equipment, Lessor shall publicly or privately sell or lease the equipment in such manner as Lessor may in his reasonable discretion determine appropriate.  The proceeds of the sale or Lease will be applied to reimburse the Lessor in accordance with Exhibit B and any excess shall be returned to the Lessee.

108.    The above equipment has not been listed for sale or been handled in a commercially reasonable fashion by Mr. Reece and/or Evergreen as a purported creditor of Signature Homes.  Upon information and belief, Mr. Reece and/or Evergreen continues to retain the equipment notwithstanding the lack of any lawful basis for doing so.

109.    Mr. Reece and/or Evergreen have never publicly sold the equipment nor accounted for the proceeds of the sale or lease of the equipment, all in breach of the terms of the Equipment Finance Lease Agreements.

110.    Signature Homes estimates its equity in the existing equipment to be approximately $101,343.

### L.    Mr. Reece Caused Signature Homes To Make Fraudulent Payments To Parties Personally Related To Mr. Reece

111.    Mr. Reece, along with ARR and the Disloyal Employees caused Signature Homes to pay his wife, Mrs. Reece, $10,532 without any invoice backup or proper explanation of the purpose of these payments.

112.    Upon information and belief, Jones Quality Contracting is owned by members of the Reece Family.   Jones Quality Contracting's address is PO Box #222, Frostburg, Maryland and this is the same address used by Mr. and Mrs. Reece to divert invoices from Signature Homes as set forth above.  Mr. Reece also used the alias "Brandon Keely" with PO Box #222.

113.    On April 5, 2005, Mr. Reece, ARR and the Disloyal Employees caused Signature Homes to pay Jones Quality Contracting $8,450.00 without any invoice backup or proper explanation of the purpose of these payments.

114.    On April 27, 2005, Mr. Reece, ARR and the Disloyal Employees caused Signature Homes to pay Jones Quality Contracting $4,850.00 without any invoice backup or proper explanation of the purpose of these payments.  Thus, the total payment to Jones Quality Contracting for 2005 was $13,300.

115.    Signature Homes issued a Form 1099-MISC to "Jones Quality Contracting, Brandy Reece" showing non-employee compensation of $13,300 for 2005.  This 1009-MISC used Mrs. Reece's social security number.

116.    It is believed and therefore averred that Mr. Reece's father-in-law, Defendant J. Jones, owns and/or manages Jones Quality Contracting.

117.    Mr. Reece, ARR and the Disloyal Employees caused Signature Homes to pay to Custom Brick Layers & Builders, $13,290 for brick/stone work to perform the identical work that Universal Masonry performed on the same home for only $3,010.  Custom Brick Layers & Builders is owned by Mrs. Reece's father, Mr. J Jones.

118.    Mr. Reece, ARR and the Disloyal Employees caused Signature Homes to include Mr. Reece's mother-in-law, Sharon Yonker, on Signature Homes' health insurance policy in 2006, even though she was not an employee of the company.  The premium payments for her total $1,365.49.

119.    The transfers, withdrawals and payments above to and on behalf of the Reece Family and Reece Affiliated Entities were made with the specific intent to defraud the Plaintiffs. These above schemes constitute a scheme or artifice to defraud or for obtaining money or property by means of false or fraudulent pretenses, representations or promises.

120.    Mr. Reece, ARR, Reece Family, Reece Affiliated Entities and the Disloyal Employees carried out the fraudulent schemes by means of mail\wire in interstate commerce for the purpose of executing such scheme or artifice.

**M.  Mr. Reece's Creation And Deceptive Use of Western Maryland Construction Solutions, LLC**

121.    On or about March 1, 2006, Mr. Reece, ARR and the Disloyal Employees caused Signature Homes to use a subcontractor named "Western Maryland Construction Solutions" to perform work.  Upon information and belief, Mr. and Mrs. Reece are the owners of "Western Maryland Construction Solutions."

122.     Neither Mr. and Mrs. Reece's ownership interest nor the intended scope of the use of "Western Maryland Construction Solutions" was disclosed to Mr. Bell or BG Realty.

123.     On or about May 25, 2006, Mr. Bell questioned the use and identity of "Western Maryland Construction Solutions."  Mr. Reece represented to Mr. Bell that "Western Maryland Construction Solutions" was created for the sole purpose of providing spray foam insulation services as a subcontractor of Signature Homes.

124.     On May 26, 2006, Mr. Reece caused Articles of Organization to be filed with the State Department of Assessments & Taxation for Western Maryland Construction Solutions, LLC.

125.     Mr. Reece did not disclose the subsequent creation of Western Maryland Construction Solutions to Mr. Bell.

126.     Under the business plan and associated agreement between Mr. Bell and Mr. Reece, any construction related entity associated with Mr. Reece  could only charge costs plus overhead on any construction work performed on the various projects in which they were involved as partners.   All profits related to construction would flow to the development company associated with each project and would be distributed to both Mr. Reece and Mr. Bell upon their mutual agreement.

127.     Upon information and belief, Mr. and Mrs. Reece created Western Maryland Construction Solutions with the express intent of charging Signature Homes an amount in excess of costs plus overhead for services allegedly performed in order to wrongfully transfer funds from Signature Homes to an entity under their joint and sole ownership and control.

128.     Mr. Reece, ARR and the Disloyal Employees actively concealed the scope of the use of Western Maryland Construction Solutions from Mr. Bell and BG Realty.

**N. Scheme To Use Western Maryland Construction Solutions, LLC To Fraudulently Siphon Funds From Signature Homes, LLC**

129.     From June 9, 2006 to July 21, 2006, Mr. Reece, ARR and the Disloyal Employees caused Signature Homes to pay $101,411 to Western Maryland Construction Solutions without any supporting documentation or invoice backup.

130.     In addition to these direct and unsubstantiated payments, Mr. Reece, ARR and the Disloyal Employees caused Signature Homes to use Western Maryland Construction Solutions, LLC, not only for insulation, but also for brick and stonework, trenching for a gas line and taps, installation of gas taps, installation of duct bank electric taps and installation of water and sewer taps.

131.     Mr. Bell had no knowledge that Western Maryland Construction Solutions was being utilized for any of these additional services.

132.     It is believed and therefore averred that under the direction of Mr. Reece, Western Maryland Construction Solutions utilized the employees and resources of Signature Homes to perform many, if not all, of the services allegedly performed by Western Maryland Construction Solutions for Signature Homes.  No payment was made to Signature Homes for those employees or resources.

133.     Mr. Reece and Western Maryland Construction Solutions fraudulently overcharged Signature Homes for the work far in excess of the fair market value for the services performed.

134.     Western Maryland Construction Solutions  billed Signature Homes $74,600 for insulation work on 14 separate homes.  Signature Homes was overcharged approximately $36,846 based upon billings and proposals from independent subcontractors for the same and similar work.

135.    Western Maryland Construction Solutions  billed Signature Homes $85,834.51 for brick/stone work on 17 separate homes.  Signature Homes was overcharged $26,193 based upon billings and proposals from independent subcontractors  for the same and similar work.

136.    Western Maryland Construction Solutions  billed Signature Homes $81,182 for trenching and back-filling gas lines installed by Columbia Gas and for installation of 14 gas taps.  Signature Homes was overcharged $31,798 based upon independent and competitive rates in the marketplace.

137.    Western Maryland Construction Solutions billed Signature Homes $78,600 for work installing electrical duct banks and electric/phone taps.  Signature Homes was overcharged $55,500 based upon independent and competitive rates in the marketplace.

138.    Western Maryland Construction Solutions billed Signature Homes $50,000 by Signature Homes for work installing 18 water taps and 32 sewer taps.  Signature Homes was overcharged $32,810 based upon independent and competitive rates in the marketplace.

139.    The sanitary sewer and water tap work allegedly performed by Western Maryland Construction Solutions was faulty and has not performed according to specifications.  The cost incurred to date to correct Western Maryland Construction Solutions' faulty workmanship is approximately $81,008, and there remains approximately $79,000 in additional work that needs to be performed.

140.    Mr. Reece and Western Maryland Construction Solutions fraudulently caused Signature Homes to lease Signature Homes' own equipment from Western Maryland Construction Solutions.

141.    Upon information and belief, Western Maryland Construction Solutions invoiced Signature Homes for the identical work invoiced by the Walkers.

142.    This fraudulent contracting and billing scheme enabled Signature Homes to transfer funds to an entity controlled and owned by Mr. Reece.

143.    The transfers, withdrawals and payments, *supra,* to and on behalf of Western Maryland Construction Solutions were made with the specific intent to defraud the Plaintiffs. These schemes constitute a scheme or artifice to defraud or for obtaining money or property by means of false or fraudulent pretenses, representations or promises.

144.    Mr. Reece, ARR, Western Maryland Construction Solutions and the Disloyal Employees carried out the fraudulent schemes by means of mail\wire in interstate commerce for the purpose of executing such scheme or artifice.

### O.   Misuse And Appropriation Of Signature Homes' Employees and Resources To Construct A  Building For Western Maryland Construction Solutions at 16 Maple Street, Frostburg, Maryland

145.     Mr. Reece, ARR and the Disloyal Employees diverted funds and resources from Signature Homes for the purpose of constructing a building at 16 Maple Street, Frostburg, Maryland.

146.    Plaintiffs have been unable to locate any written contract for Signature Homes' for the project at 16 Maple Street.

147.    It is believed and therefore averred that Mr. Reece utilized employees and resources of Signature Homes to construct the 3,000 square foot, 2 story building that is currently utilized by Western Maryland Construction Solutions as its offices.

148.    Mr. Bell had no knowledge that Signature Homes' employees and resources were being utilized to construct said office building.

149.    The costs incurred by Signature Homes related to this construction were $144,354 ($120,295 of total paid and unpaid expense plus 20% for overhead and profit).   Mr. Reece reimbursed the company only $87,366.86 and there remains a difference of $56,987.

150.    Signature Homes' employees were instructed to remove from the accounting system September and October 2006 invoices associated with the 16 Maple Street project totaling $15,055.45.   These invoices included $7,273.95 from Glass Service of Cumberland, Inc., $4,676.00 from Overhead Door Co. of Cumberland, and $3,105.50 from B&B Concrete (Signature Homes has discovered that these invoices were for Evergreen's Building at 16 Maple Street).

151.    The misuse and conversion of Signature Homes' resources and assets were with the specific intent to defraud the Plaintiffs.   These schemes constitute a scheme or artifice to defraud or for obtaining money or property by means of false or fraudulent pretenses, representations or promises.

152.    Mr. Reece, Mrs. Reece, ARR and the Disloyal Employees carried out those fraudulent schemes by means of mail\wire in interstate commerce for the purpose of executing such scheme or artifice.

**P.  Misuse And Appropriation Of Signature Homes' Employees and Resources To Construct A  Building And Other Improvements To Mr. and Mrs. Reece's Home Located At 1857Chestnut Ridge Road, Grantsville, Maryland 21536**

153.    Mr. Reece, Mrs. Reece, ARR and the Disloyal Employees diverted funds and resources from Signature Homes for the purpose of constructing a building at Mr. and Mrs. Reece's home and property located At 1857 Chestnut Ridge Road, Grantsville, Maryland 21536.

154.    It is believed and therefore averred that Mr. Reece utilized employees, equipment and resources from Signature Homes to construct a large four bay "garage" with a vaulted ceiling and picture windowed second floor.

155.    The costs incurred by Signature Homes related to this construction was $99,347.88 ($82,789.90 plus $20% for overhead and profit).   Mr. Reece did not reimburse Signature Homes for any of this work.

156.    Additionally, Mr. and Mrs. Reece extensively remodeled their existing home and made extensive improvements to their property utilizing the employees and resources of Signature Homes.

157.    It is believed and therefore averred that the costs incurred by Signature Homes related to Mr. and Mrs. Reece's home and property improvement exceeded $150,000.   Mr. Reece did not reimburse Signature Homes for any of this work.

158.    The above misuse and conversion of Signature Homes' resources and assets were made with the specific intent to defraud the Plaintiffs.   These schemes constitute a scheme or artifice to defraud or for obtaining money or property by means of false or fraudulent pretenses, representations or promises.

159.    Mr. Reece, Mrs. Reece, ARR and the Disloyal Employees carried out these fraudulent schemes by means of mail\wire in interstate commerce for the purpose of executing such scheme or artifice.

**Q. Fraudulent Schemes With the Walkers**

160.    Mr. Reece, ARR and the Walkers conspired to defraud Signature Homes through a scheme of false invoicing to Signature Homes for work that was either never performed or insufficiently performed by the Walkers.

161.    Upon information and belief Mr. Reece and ARR would receive a portion of these fraudulent payments in return for causing Signature Homes to issue these payments to the Walkers.

162.    Signature Homes did not execute any contract with Walker to perform any services.

163.    Signature Homes did not execute any contract with Walker and Son to perform any services.

164.    From February 2005 through October, 2006, Mr. Reece, ARR and the Disloyal Employees caused Signature Homes to make payments to the Walkers totaling $202,426 without any invoice backup or proper explanation of the purpose of these payments.

165.    From February 2005 through October, 2006, Mr. Reece, ARR and the Disloyal Employees caused Signature Homes to make payments to the Walkers totaling $230,977 without the customary  invoice detail or full explanation of the purpose of these payments.  No independent contractor would pay a subcontractor on these invoices containing such little description.  In addition, the poor quality of the work allegedly performed by Walker & Son has caused Signature Homes to hire other contractors to repair this work.  It is believed and therefore averred that Mr. Reece did not inspect Walker & Son's work as was his responsibility as President of Signature Homes and the person in charge of its daily construction operations. He should not have authorized payment to Walker & Son on these invoices.

166.    From April 9, 2006 to August 12, 2006, Walker was apparently also an employee of Signature Homes and received a $7,213.74 in employee compensation during this period. During this same time, the Walkers  were invoicing Signature Homes for work allegedly performed by Walker.  Defendant Douglas certified both payroll and subcontractor work to the

City of Cumberland for the project that the Walkers allegedly performed.   It is believed and therefore averred, that the payroll payments were another fraudulent method for compensating Walker for his participation in the various schemes to defraud Signature Homes.

167.   Upon information and belief, Walkers sent invoices to Signature Homes for the identical work invoiced by Western Maryland Construction Solutions.

168.   Upon information and belief, Walkers did not have sufficient number of employees to perform the services set forth on the invoices to Signature Homes.   During a 2007 insurance audit conducted for the period 2005-2006, the Walkers' insurance agent represented to Signature Homes that the Walkers had no employees during 2005 and 2006.

169.   Defendants Walker and Walker & Son fraudulently benefited from these payments because (1) the services were never performed or (2) were performed in such a poor and improper manner that they had no right to receive payment for such poor quality and unfinished work.

170.   The schemes were made with the specific intent to defraud the Plaintiffs.   These schemes constitute a scheme or artifice to defraud or for obtaining money or property by means of false or fraudulent pretenses, representations or promises.

171.   Mr. Reece, ARR, the Disloyal Employees, and the Walkers carried out this fraudulent schemes by means of mail\wire in interstate commerce for the purpose of executing such scheme or artifice.

### R.  Diverting Corporate Opportunity & Continuing Harm

172.   Mr. Reece, ARR and Defendant Douglas wrongfully diverted a custom home customer, Dr. Jonathan C. Gibralter, from Signature Homes to Western Maryland Construction Solutions.   In August of 2006, Mr. Reece, ARR and Defendant Douglas caused Western

Maryland Construction Solutions to purchase the property for the Gibraltar Project.  The lost profit and overhead for Signature Homes is estimated to be $112,938.

173.    There were other custom homes projects that were diverted, including  the "Reed Project" in Maryland and "Brown Project" located in West Virginia.

174.    Upon information and belief there were other construction projects that were diverted   including "Sisca," "Hillcrest." "Reed-Harwood," "Markey," "Kennedy," "St. Andrew," and "Klosterman."

175.    Upon information and belief, Western Maryland Construction Solutions is continuing to work on the Gibraltar Project.

176.    Upon information and belief, Western Maryland Construction Solutions is continuing to work on the Reed Project.

177.    On or about June 1, 2007, upon information and belief Western Maryland Construction Solutions completed the Brown Project in West Virginia.

178.    The diversion of business opportunities from Signature Homes was made with the specific intent to harm the Plaintiffs.  These schemes constitute a scheme or artifice to defraud or for obtaining money or property by means of false or fraudulent pretenses, representations or promises.

179.    Mr. Reece, ARR and the Disloyal Employees carried out this fraudulent schemes by means of mail\wire in interstate commerce for the purpose of executing such scheme or artifice.

**S.  Other Schemes and Victims Of Defendants' Conspiracy**

180.    Plaintiffs were not the only victims of Defendants' fraudulent schemes.  Plaintiffs have uncovered a number of victims of the Defendants' conspiracy.

181.    Mr. Reece, the Reece Family, ARR and the Disloyal Employees made fraudulent Draw Requests to Frostburg falsely representing that properties were either completed or substantially completed.   Based upon these false representations, Frostburg provided the requested funds.   Frostburg subsequently discovered that a number of the homes were incomplete and needed substantial work performed to complete these homes.  From December 2005 through April 2006, Frostburg was charged an additional $246,284 to complete construction on properties that were falsely represented to be completed or substantially completed.  Additional repair and rehabilitation costs continue to be incurred.  Plaintiffs have discovered an e-mail correspondence dated August 10, 2006 from Defendant Angello to Mr. Reece and the other Disloyal Employees which reads "Do we have a final, actual amount owed to us by Annapolis (and whether they're going to pony up)?  We've been drawing ahead to cover this for a while now, as you know, but I'm starting to run out of fudge-able pictures…We're pretty far out in front on most of the houses up at Prichard."

182.    On July 20, 2005, Mr. Reece misrepresented to Beckwith Machinery Company on an Application/Update for Credit/Financing that Evergreen was a trade name for Signature Homes and therefore the two companies were the same.  Mr. Reece wrongfully used Signature Homes' credit to obtain credit for Evergreen.

183.    On February 22, 2005, Mr. Reece, Mrs. Reece, ARR and the Disloyal Employees caused Signature Homes to borrow $231,451 from Hoblitzell National Bank.  The loan was secured by a UCC Financing Statement which indicated that a 198 312B Caterpillar Excavator was listed as collateral on the loan.  There is a Bill of Sale for a 198 312B Caterpillar Excavator from Defendant Les Walker for $48,000 but there is no record of any payment to Defendant Les Walker nor can Plaintiffs locate a 198 312B Caterpillar Excavator.  In addition, the same 198

312B Caterpillar Excavator appears on a lease from Evergreen to Signature Homes.  Signature Homes did not own the 198 312B Caterpillar Excavator at the time of the loan and Mr. Reece, Mrs. Reece and the Disloyal Employees made false representations to HBN.

184.    On or about April 1, 2006, Mr. Reece, the Reece Family, ARR and the Disloyal Employees made false representations to Optimum Choice, Inc. that Mrs. Reece's mother, Sharon L. Yonker, was an employee of Signature Homes when she was not, in order to fraudulently obtain health, dental and life/disability insurance for Mrs. Yonker.  Signature Homes was charged $1,365 in additional premiums for Mrs. Yonker.

185.    Mr. Reece defrauded Mr. Bell and other investors regarding the purchase of  a concrete plant by Frostburg Concrete, LLC.  Mr. Reece intentionally misrepresented to Mr. Bell and other investors that the owner of the concrete plant to be purchased by Frostburg Concrete, LLC was indebted to Mr. Reece for $57,000 and that following the acquisition by Frostburg Concrete, LLC Mr. Reece should directly receive $57,000.  Following the acquisition by Frostburg Concrete, LLC, the company paid Mr. Reece the $57,000 allegedly owed to Mr. Reece.  It was subsequently discovered that the previous owner of the concrete plant was not indebted to Mr. Reece and that there was no legitimate basis for the $57,000 payment to Mr. Reece.

186.    Mr. Reece sold topsoil from the development sites owned by third parties and kept the proceeds from these sales.

**T.  Additional Participation In Fraudulent Schemes By The Disloyal Employees**

187.    Defendant Angello set up Western Maryland Construction Solutions' accounts and participated while an employee of Signature Homes, in Western Maryland Construction Solutions' fraudulent billing schemes set forth above.  Defendant Angello knew that Western

Maryland Construction Solutions was not properly performing the services it was being paid to perform. Defendant Angello caused Signature Homes to make payments to Western Maryland Construction Solutions based upon no invoices at all, inflated invoices, and invoices for work that was either never completed or poorly completed.

188. Defendant Angello participated in the preparation of fraudulent financial information and draw requests that were communicated to Mr. Bell, BG Group, and others, including financial institutions.

189. Defendant Angello participated in the taking of Signature Homes' assets and actually transferred some of the equipment onto Western Maryland Construction Solutions' insurance policy.

190. Upon information and belief, Defendant Angello knew of and participated in Mr. and Mrs. Reece's fraudulent utilization of Signature Homes' assets to improve their home.

191. Defendant Angello knew of and facilitated the fraudulent schemes set forth above against Signature Homes.

192. Defendant Douglas had administrative responsibilities and participated in fraudulent payments to the Reece Family, Reece Affiliated Companies, and other Defendants.

193. Defendant Douglas did not perform his internal control responsibilities, and despite his duty as the Director of Operations of Signature Homes, did not disclose the fraud being perpetrated against the company. As Director of Operations, Defendant Douglas was responsible for the bookkeeping and financial reporting.

194. Defendant Douglas also represented himself as the Director of Operations for Western Maryland Construction Solutions while employed as Director of Operations for Signature Homes.

195.    Defendant Douglas, while employed by Signature Homes, simultaneously kept the books and records for Western Maryland Construction Solutions, a clear conflict of interest. In this position, Defendant Douglas participated in Western Maryland Construction Solutions' schemes to defraud Signature Homes by generating fraudulent invoices for work that was either never performed or work that was not performed properly.  In addition, Defendant Douglas was responsible for depositing funds fraudulently received from Signature Homes pursuant to the fraudulent schemes, including the payment of funds without any invoice.

196.    Defendant Douglas caused and/or permitted fraudulent transactions and reporting for both Signature Homes and Western Maryland Construction Solutions.

197.    Defendant Douglas failed to properly inform Erie Insurance Company of periodic and regular changes in Signature Homes' payroll during the policy year of November 2005 to October 2006.   This failure to timely update the insurance company resulted in an approximately $25,000 adjustment to the premium to be paid in 2007 after Mr. Reece and the Disloyal Employees left Signature Homes.

198.    Defendant Douglas participated in the diversion of corporate opportunities from Signature Homes to Western Maryland Construction Solutions.

199.    Defendant Douglas withdrew $5,483.50 on August 18, 2006 from a Signature Homes Account without any backup or justification for the charges.

200.    Upon information and belief Defendant Douglas was the author of a "task list" provided to the Disloyal Employees to prevent their various fraudulent schemes from being discovered by Mr. Bell and BG Realty.

201.    Defendant Douglas knew of and facilitated the fraudulent schemes set forth above against Signature Homes.

202.    Defendant Douglas fraudulently misrepresented to potential custom home customers that Signature Homes was a subsidiary of Evergreen and participated in the scheme to divert corporate opportunity.

203.    It is believed and therefore averred that Defendant Douglas forged signatures and notaries on at least one equipment sale.

204.    Upon information and belief Defendant Douglas sold Signature Homes' telephone system and did not deposit the proceeds in a Signature Homes account.  It is believed and therefore averred that he kept those proceeds for himself or shared some or all of those proceeds with Mr. Reece and/or the Reece Family.

205.    Defendant Kimble participated in Western Maryland Construction Solutions' schemes to defraud Signature Homes.  It is believed and therefore averred that Defendant Kimble knew that Western Maryland Construction Solutions was not properly performing the work for which it was invoicing Signature Homes.  Defendant Kimble permitted Signature Homes to pay Western Maryland Construction Solutions for work that was either never performed, work performed at an inflated price and work performed in such a poor manner that payment should not have been made.

206.    Defendant Kimble participated in Les Walker's schemes to defraud Signature Homes.  It is believed and therefore averred that Defendant Kimble knew that the Walkers were not properly performing the work for which they were invoicing Signature Homes.  Defendant Kimble permitted Signature Homes to pay the Walkers for work that was either never performed, work performed at an inflated price and work performed in such a poor manner that payment should not have been made.

207.    It is believed and therefore averred that Defendant Kimble ordered materials and utilized Signature Homes' equipment and property for his own home without any reimbursement.

208.    On or about January 10, 2006, Defendant Kimble approved a Les Walker Purchase Order for equipment shipped directly to Mr. Reece.  There was no reimbursement by Mr. Reece to Signature Homes.

209.    Defendant Rollins participated in Western Maryland Construction Solutions' schemes to defraud Signature Homes.  It is believed and therefore averred that Defendant Rollins knew that Western Maryland Construction Solutions was not properly performing the work for which it was invoicing Signature Homes.  Defendant Rollins prepared checks for payment to Western Maryland Construction Solutions without any invoice backup.  Defendant Rollins permitted Signature Homes to pay Western Maryland Construction Solutions for work that was either never performed, work performed at an inflated price and work performed in such a poor manner that payment should not have been made.

210.    Defendant Rollins participated in the Walkers' schemes to defraud Signature Homes.  It is believed and therefore averred that Defendant Rollins knew that the Walkers were not properly performing the work for which they were invoicing Signature Homes.  Defendant Rollins prepared checks for payment of the Walkers without any invoice backup.  Defendant Rollins permitted Signature Homes to pay the Walkers for work that was either never performed, work performed at an inflated price and work performed in such a poor manner that payment should not have been made.

211.    Defendant Rollins, as the bookkeeper, participated in the preparation of fraudulent financial information and draw requests that were communicated to Mr. Bell, BG Realty, and

others, including financial institutions.  During the period September 2005 to November 2006, Mr. Bell and BG Realty attempted to review, understand and compile accurate accounting records for Signature Homes.  Defendant Rollins explicitly misled Mr. Bell and BG Realty as to the true nature of the fraudulent transactions detailed above in conversations both in person and over the telephone and actively engaged in the concealment of the above frauds by fraudulently preparing and/or causing to be prepared false and misleading accounting records.

212.    Defendant Rollins provided bookkeeping services and generated fraudulent invoices for the Walkers while an employee of Signature Homes.

213.    It is believed and therefore averred that Defendant Rollins participated in the taking of Signature Homes' assets as set forth above

214.    It is believed and therefore averred that Defendant Rollins participated in Mr. and Mrs. Reece's fraudulent utilization of Signature Homes' assets to improve their home.  As the bookkeeper, Defendant Rollins would prepare payments for vendors and suppliers for labor and materials used for said improvement without reimbursement by Mr. and Mrs. Reece.

215.    Defendant Rollins knew of and facilitated the fraudulent schemes set forth above against Signature Homes.

**U.  Signature Homes' Financial Difficulties And Mr. Reece's "Quitting"**

216.    All of the aforementioned actions were in furtherance of Mr. Reece's plan to divert business opportunities and revenues from Signature Homes to entities owned or controlled by him all in contravention of the agreed upon business plan he had with Mr. Bell.

217.    By April 2006, Mr. Bell became concerned over Signature Homes' inability to complete the infrastructure construction and home construction at Prichard Farms in a timely manner.  Discussions occurred between the members of Frostburg about replacing Signature

Homes as the general contractor at Prichard Farms with another outside contractor.  Mr. Reece vigorously resisted any change in the contractor and the decision was made not to replace Signature Homes with an outside contractor.

218.    Mr. Reece, ARR and the Disloyal Employees failed to provide financial reports to Mr. Bell for Signature Homes despite repeated requests. .

219.    Mr. Reece engaged in increasingly bolder efforts to strip funds from Signature Homes and caused  Signature Homes to experience more significant financial difficulties in the fall of 2006.

220.    In October 2006, Mr. Reece informed Mr. Bell that Signature Homes would be unable to meet its next payroll and that it owed a list of creditors money for past due work at Prichard Farms for which it did not have any funds to make payment.

221.    On October 26, 2006 Mr. Bell, Mr. Reece and others met to discuss this situation and Mr. Reece stated that he had no plan for addressing the cash flow crisis despite being in charge of managing operations for Signature Homes.  In addition, he announced that he was leaving for the Caribbean for a vacation and was gone for the next two weeks.  Mr. Reece was unavailable for contact during the next  two weeks.

222.    Mr. Bell and/or his affiliated entities advanced approximately Fifty Thousand Dollars ($50,000.00) to cover Signature Homes' payroll and to pay other pressing debts.

223.    On or about November 15, 2006, upon Mr. Reece's return, he  announced that he was "quitting" and informed Mr. Bell that he had already terminated all but a few key employees of Signature Homes.

224.    On November 16, 2006, Defendants Angello, Douglas and Rollins entered Signature Homes' office and shredded countless documents.  It is believed and therefore averred

that this was done at the direction of Mr. and Mrs. Reece.   Upon information and belief Defendants Angello and Rollins had been terminated approximately 6 days earlier on or about November 10, 2006 by Mr. Reece. Plaintiffs' employees heard in the background the shredder operating continually during telephone conferences and upon their arrival at the office discovered an enormous quantity of shredded paper.

225.     After Mr. Reece's departure from Signature Homes, some of the diversion of assets and revenues of Signature Homes to Mr. Reece  and the other Defendants, as well as the extent of fraud and negligence committed by the Disloyal Employees became known to Mr. Bell.

### COUNT I
### VIOLATIONS OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT (RICO) PURSUANT TO 18 U.S.C. §  1962 (ALL DEFENDANTS)

226.     The allegations of Paragraphs 1 through 225 incorporated herein by reference with the same force and effect as if set forth in full below.

227.     Defendants are "persons" within the meaning of 18 U.S.C. §§ 1961(3), 1962(b), 1962(c), and 1962(d).

228.     At all relevant times, the Reece Family with the Reece Affiliated Entities, the Disloyal Employees, and the Walkers collectively, constituted an "enterprise" within the meaning of 18 U.S.C. §§  1961(4), 1962(b), and 1962(c) ("the Reece Criminal Enterprise"). The enterprise was established for the common purpose of carrying out various schemes to fraudulently siphon money from Signature Homes as well as defraud other businesses and financial institutions.

229.     The Reece Criminal Enterprise was engaged in, and its activities affected, interstate commerce by requisitioning labor, material and equipment that originated outside the

State of Maryland and/or traveled through interstate commerce.  Additionally, a primary target of the Reece Criminal Enterprise, Signature Homes, was engaged in custom home construction outside Maryland in West Virginia.

230.    The Reece Criminal Enterprise is an ongoing organization whose associates function as a continuing unit.

231.    The Reece Criminal Enterprise is an entity separate and apart from the pattern of activity in which it engages.

232.    Defendants violated 18 U.S.C. § 1962(b) by directly and indirectly acquiring and maintaining control of Signature Homes and the Reece Affiliated Entities which are "enterprises" within the meaning of 18 U.S.C. § 1961(4) and which engage in, or the activities of which affect, interstate commerce through a pattern of racketeering activity as alleged above.

233.    Defendants violated 18 U.S.C. § 1962(c) by directly and indirectly conducting and participating in the conduct of the Reece Criminal Enterprise's affairs through a pattern of racketeering activity as alleged above.

234.    From at least 2005 and continuing until the present, Defendants repeatedly engaged in acts indictable under 18 U.S.C. § 1341 (relating to mail fraud), 18 U.S.C. § 1343 (relating to wire fraud), and used the United States mail as well as wire and other communications in interstate commerce in connection with these acts, thereby engaging in "racketeering activity" within the meaning of 18 U.S.C. § 1961(B) and (D) in the course of the described criminal scheme.

235.    The repeated violations of 18 U.S.C. §§ 1341 and 1343, by Defendants have extended over a period of years and involved distinct and independent criminal acts. They were neither isolated nor sporadic events, but involved regular and repeated violations of law to

accomplish Defendants' desired ends in the course of the continuing businesses of the Reece Criminal Enterprise. These acts were related to each other by virtue of, among other things, (a) common participants, (b) common victims, and (c) common purposes, which included profiting at the expense of Signature Homes and its other members. As such, this conduct constitutes a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(5).

236.    Defendants also conspired to violate 18 U.S.C. § 1962(c) as described above in violation of 18 U.S.C. § 1962(d).

237.    Defendants violation of 18 U.S.C. § 1962(b), (c), and (d) caused Plaintiffs to suffer direct injury to its business and property, which losses were in the millions of dollars, and inflicted the other damages and losses described above.

238.    The foregoing conduct of Defendants was malicious, performed with intent to injure Plaintiffs, and was without justification or privilege.

WHEREFORE, Plaintiffs respectfully request that this Court:

A. Enter a judgment in favor of Plaintiffs and against Defendants, jointly and severally, in an amount to be determined at trial, but in excess of Ten Million Dollars ($10,000,000), to compensate the Plaintiffs for any losses proximately caused by the Defendants' RICO violations to the extent such losses are reasonably capable of calculation;

B.  Enter a judgment in favor of Plaintiffs and against Defendants, jointly and severally, to disgorge all revenue, profits, earnings, payroll payments and other transfers of cash and assets from Signature Homes in an amount to be determined at trial,

C.  Award treble damages for Defendants' RICO violations;

D.  Grant Plaintiffs the costs of this action, including reasonable attorneys' fees, and such other and further relief as this Court deems just and appropriate.

## COUNT II
## FRAUD
## (ALL DEFENDANTS)

239.     The allegations of Paragraphs 1 through 225 incorporated herein by reference with the same force and effect as if set forth in full below.

240.     As set forth above, Defendants made intentional misrepresentations and material omissions to the Plaintiffs in furtherance and concealment of their fraudulent schemes.

241.     As more fully set forth above, Mr. Reece intentionally misled the Plaintiffs regarding payments to himself, payments to the Reece Family, payments to the Reece Affiliated Entities, and  payments to the Walkers.  Defendant Mr. Reece prepared and/or caused to be prepared intentionally misleading financial information to be disclosed to the Plaintiffs, financial institutions and others in furtherance and in concealment of the fraudulent schemes. Defendant Mr. Reece, as the individual behind Defendants Evergreen and Western Maryland Construction Solutions intentionally mislead the Plaintiffs by preparing and submitting false invoices or claims for payment for work that was either never performed, performed at an unreasonably high price or so poorly performed that payment would not be justified.  Other details on Defendant Reece's intentionally misleading communications are set forth in the preceding paragraphs of this Complaint.

242.     As more fully set forth above, Defendants Reece Family intentionally mislead the Plaintiffs by preparing and submitting false invoices or claims for payment for work that was either never performed, performed at an unreasonably high price or so poorly performed that payment would not be justified.  Other details on Defendants Reece Family's intentionally misleading communications are set forth in the preceding paragraphs of this Complaint.

243.    As more fully set forth above, Defendants Reece Affiliated Entities intentionally misled the Plaintiffs by preparing and submitting false invoices or claims for payment for work that was either never performed, performed at an unreasonably high price or so poorly performed that payment would not be justified.  Other details on Defendants Reece Affiliated Entities' intentionally misleading communications are set forth in the preceding paragraphs of this Complaint.

244.    As more fully set forth above, Defendants Disloyal Employees accepted, approved, paid and recorded, false invoices or claims for payment for work that was either never performed, performed at an unreasonably high price or so poorly performed that payment would not be justified.  Additionally, the Disloyal Employees participated in intentionally misleading bookkeeping entries to create loan deposits and other transactions intentionally designed to mislead the true nature of the transaction.  The Defendant Disloyal Employees caused these fraudulent transaction to be entered into the books and records of Signature Homes and intentionally reported misleading financial and other to the Plaintiffs, financial institutions and others.  Defendant Douglas was responsible for the bookkeeping for Defendant Western Maryland Construction Solutions and intentionally mislead the Plaintiffs by preparing and submitting false invoices or claims for payment for work that was either never performed, performed at an unreasonably high price or so poorly performed that payment would not be justified.  Other details on Disloyal Employees' intentionally misleading communications are set forth in the preceding paragraphs of this Complaint.

245.    As more fully set forth above, the Walkers intentionally misled the Plaintiffs by preparing and submitting false invoices or claims for payment for work that was either never performed, performed at an unreasonably high price or so poorly performed that payment would

not be justified.  Other details on the Walkers intentionally misleading communications are set forth in the preceding paragraphs of this Complaint.

246.    Plaintiffs relied on the Defendants' intentional misrepresentations and omissions.

247.    The foregoing conduct of Defendants was malicious, performed with intent to injure Plaintiffs, and was without justification or privilege.

248.    As a direct and proximate result, Plaintiffs have suffered actual damages.

WHEREFORE, Plaintiffs respectfully request that this Court:

A. Enter a judgment in favor of Plaintiffs and against Defendants, jointly and severally, in an amount to be determined at trial, but in excess of Ten Million Dollars ($10,000,000), to compensate the Plaintiffs for any losses proximately caused by the Defendants' fraud to the extent such losses are reasonably capable of calculation;

B. Award punitive damages in favor of Plaintiffs and against Defendants in an amount of Twenty Million ($20,000,000).

C.  Grant Plaintiffs the costs of this action, including reasonable attorneys' fees, and such other and further relief as this Court deems just and appropriate.

**COUNT III**
**CONSTRUCTIVE FRAUD**
**(ALL DEFENDANTS)**

249.    The allegations of Paragraphs 1 through 225 incorporated herein by reference with the same force and effect as if set forth in full below.

250.    Defendants, ARR, Mr. Reece and the Disloyal Employees owed Plaintiffs fiduciary duties, including those of good faith, care, and loyalty.

251.    Defendants ARR, Mr. Reece and the Disloyal Employees were in a relationship of trust and confidence with the Plaintiffs.

252.    As an employee of Signature Homes, Defendants Walker owed Plaintiffs fiduciary duties, including those of good faith, care, and loyalty.

253.    As an employee of Signature Homes, Defendant Walker was in a relationship of trust and confidence with the Plaintiffs.

254.    As purported vendors and contractors of Signature Homes, Defendants Reece Family and Reece Affiliated Entities owed Plaintiffs a duty of good faith.

255.    As entities owned or controlled by Mr. Reece and/or members of the Reece Family, Defendants Reece Affiliated Entities was in a relationship of trust and confidence with Signature Homes.

256.    As set forth above, Defendants ARR, Mr. Reece and the Disloyal Employees breached their fiduciary duties by diverting funds, assets and business opportunities from Signature Homes to the Reece Family and Reece Affiliated Entities.

257.    As set forth above, Defendants Reece Family and Reece Affiliated Entities breached their duty of good faith and care by diverting funds, assets and business opportunities from Signature Homes to the Reece Family and Reece Affiliated Entities.

258.    As set forth above, Defendants used their confidential relationship to deceive and injure the Plaintiffs.

259.    The foregoing conduct of Defendants was malicious, performed with intent to injure Plaintiffs, and was without justification or privilege.

260.    As a direct and proximate result of Defendants' actions, Plaintiffs have suffered actual damages.

WHEREFORE, Plaintiffs respectfully request that this Court:

A. Enter a judgment in favor of Plaintiffs and against Defendants, jointly and severally, in an amount to be determined at trial, but in excess of Ten Million Dollars ($10,000,000), to compensate the Plaintiffs for any losses proximately caused by the Defendants' constructive fraud to the extent such losses are reasonably capable of calculation;

B. Award punitive damages in favor of Plaintiffs and against Defendants in an amount of Twenty Million Dollars ($20,000,000).

C. Grant Plaintiffs the costs of this action, including reasonable attorneys' fees, and such other and further relief as this Court deems just and appropriate.

### COUNT IV
### BREACH OF FIDUCIARY DUTIES
### (DEFENDANTS ARR, MR. REECE & DISLOYAL EMPLOYEES)

261.    The allegations of Paragraphs 1 through 225 incorporated herein by reference with the same force and effect as if set forth in full below.

262.    ARR, Mr. Reece and the Disloyal Employees owed Plaintiffs fiduciary duties and required exercise their duties in good faith and with loyalty, in a manner reasonably believed to be in the best interest and benefit of Signature Homes, and with the care that ordinary, prudent people in like positions would use under similar circumstances, without any self-interest or self-dealing.

263.    As set forth above, ARR, Mr. Reece and the Disloyal Employees breached those fiduciary duties by diverting funds, assets and business opportunities from Signature Homes to the Reece Family, Reece Affiliated Entities, and Walkers.

264.    As set forth above, ARR, Mr. Reece and the Disloyal Employees breached their duty of care by self-dealing and causing Signature Homes to employee and/or contract with

related parties and companies in transactions that were not fair and equitable to Signature Homes.

265.    The foregoing conduct of Defendants was malicious, performed with intent to injure Plaintiffs, and was without justification or privilege.

266.    As a direct and proximate result of the foregoing breaches of fiduciary duties, Plaintiff suffered actual damages.

WHEREFORE, Plaintiffs respectfully request that this Court:

A. Enter a judgment in favor of Plaintiffs and against Defendants, jointly and severally, in an amount to be determined at trial, but in excess of Ten Million Dollars ($10,000,000), to compensate the Plaintiffs for any losses proximately caused by the Defendants' breach of fiduciary duties to the extent such losses are reasonably capable of calculation;

B. Award punitive damages in favor of Plaintiffs and against Defendants in an amount of Twenty Million Dollars ($20,000,000).

C.  Grant Plaintiffs the costs of this action, including reasonable attorneys' fees, and such other and further relief as this Court deems just and appropriate.

### COUNT V
### CIVIL CONSPIRACY
### (ALL DEFENDANTS)

267.    The allegations of Paragraphs 1 through 225 incorporated herein by reference with the same force and effect as if set forth in full below.

268.    Defendants formed and operated a malicious combination with a common purpose to injure Plaintiffs by performing unlawful acts

269.    The foregoing conduct of Defendants was malicious, performed with intent to injure Plaintiffs, and was without justification or privilege.

270.     Defendants engaged in overt unlawful acts and conduct violative of Plaintiffs contractual and common law rights as described above, causing actual harm to the Plaintiffs.

271.     By virtue of the formation and operation of this conspiracy by Defendants, and as a consequence of the above described wrongful acts and conduct and the harm and injury caused to Plaintiffs, thereby, each Defendant, as a participant in this conspiracy, is liable as a joint tortfeasor for each and every one of the above-described acts committed by each Defendant/co-conspirator.

272.     The overt acts in furtherance of this civil conspiracy, as more fully set forth above, include Mr. Reece's intentionally misleading the Plaintiffs regarding payments to himself, payments to the Reece Family, payments to the Reece Affiliated Entities, and payments to the Walkers.   Additionally, Mr. Reece prepared and/or caused to be prepared intentionally misleading financial information to be disclosed to the Plaintiffs, financial institutions and others in furtherance and in concealment of the fraudulent schemes.  Mr. Reece, as the individual behind Evergreen and Western Maryland Construction Solutions intentionally mislead the Plaintiffs by preparing and submitting false invoices or claims for payment for work that was either never performed, performed at an unreasonably high price or so poorly performed that payment would not be justified.   Other details on Mr. Reece's other acts in furtherance of this conspiracy are set forth in the preceding paragraphs of this Complaint.

273.     The overt acts in furtherance of this civil conspiracy, as more fully set forth above, include the Reece Family's intentionally misleading the Plaintiffs by preparing and submitting false invoices or claims for payment for work that was either never performed, performed at an unreasonably high price or so poorly performed that payment would not be justified.   In addition, Mrs. Reece received direct payments from Signature Homes and

participated in improvements to her property utilizing the employees and resources of Signature Homes without proper compensation.   Other details on the Reece Family's other overt acts in furtherance of this conspiracy are set forth in the preceding paragraphs of this Complaint.

274.   The overt acts in furtherance of this civil conspiracy, as more fully set forth above, include the Reece Affiliated Entities' intentionally misleading the Plaintiffs by preparing and submitting false invoices or claims for payment for work that was either never performed, performed at an unreasonably high price or so poorly performed that payment would not be justified.   Other details on the Reece Affiliated Entities' other overt acts in furtherance of this conspiracy are set forth in the preceding paragraphs of this Complaint.

275.   The overt acts in furtherance of this civil conspiracy, as more fully set forth above, include the Disloyal Employees' accepting, approving, paying and recording, false invoices or claims for payment for work that was either never performed, performed at an unreasonably high price or so poorly performed that payment would not be justified. Additionally, the Disloyal Employees participated in intentionally misleading bookkeeping entries to create loan deposits and other transactions intentionally designed to mislead the true nature of the transaction.   The Disloyal Employees caused these fraudulent transactions to be entered into the books and records of Signature Homes and intentionally reported misleading financial and other information to the Plaintiffs, financial institutions and others.   Douglas was responsible for the bookkeeping for Defendant Western Maryland Construction Solutions and intentionally mislead the Plaintiffs by preparing and submitting false invoices or claims for payment for work that was either never performed, performed at an unreasonably high price or so poorly performed that payment would not be justified.   Other details on Disloyal Employees'

other overt acts in furtherance of this conspiracy are set forth in the preceding paragraphs of this Complaint.

276.    The overt acts in furtherance of this civil conspiracy, as more fully set forth above, include the Walkers' intentionally misleading the Plaintiffs by preparing and submitting false invoices or claims for payment for work that was either never performed, performed at an unreasonably high price or so poorly performed that payment would not be justified.   Other details on the Walkers' other overt acts in furtherance of this conspiracy are set forth in the preceding paragraphs of this Complaint.

277.    As a consequence of the foregoing, Plaintiffs has suffered and will continue to suffer harm and loss.

WHEREFORE, Plaintiffs respectfully request that this Court:

A. Enter a judgment in favor of Plaintiffs and against Defendants, jointly and severally, in an amount to be determined at trial, but in excess of Ten Million Dollars ($10,000,000), to compensate the Plaintiffs for any losses proximately caused by the Defendants' civil conspiracy to the extent such losses are reasonably capable of calculation;

B. Award punitive damages in favor of  Plaintiffs and against Defendants in an amount of Twenty Million Dollars ($20,000,000).

C.  Grant Plaintiffs the costs of this action, including reasonable attorneys' fees, and such other and further relief as this Court deems just and appropriate.

### COUNT VI
### CONVERSION
### (ALL DEFENDANTS)

278.    The allegations of Paragraphs 1 through 225 incorporated herein by reference with the same force and effect as if set forth in full below.

279.   Defendants have deprived Plaintiffs of their rights in, use of, and possession of property, including cash, equipment and other assets of Signature Homes without consent and without lawful justification.

280.   The foregoing conduct of Defendants was malicious, performed with intent to injure Plaintiffs, and was without justification or privilege.

281.   As a direct and proximate result of this wrongful conversion, Plaintiffs have suffered actual damages.

WHEREFORE, Plaintiffs respectfully request that this Court:

A. Enter a judgment in favor of Plaintiffs and against Defendants, jointly and severally, in an amount to be determined at trial, but in excess of Ten Million Dollars ($10,000,000), to compensate the Plaintiffs for any losses proximately caused by the Defendants' conversion to the extent such losses are reasonably capable of calculation;

B. Award punitive damages in favor of Plaintiffs and against Defendants in an amount of Twenty Million Dollars ($20,000,000).

C.  Grant Plaintiffs the costs of this action, including reasonable attorneys' fees, and such other and further relief as this Court deems just and appropriate.

## COUNT VI
## UNJUST ENRICHMENT
## (ALL DEFENDANTS)

282.   The allegations of Paragraphs 1 through 225 incorporated herein by reference with the same force and effect as if set forth in full below.

283.   Defendants have voluntary accepted benefits and received payments from Signature Homes which it would be inequitable for them to retain and have been unjustly enriched.

284.    The foregoing conduct of Defendants was malicious, performed with intent to injure Plaintiffs, and was without justification or privilege.

285.    As a direct and proximate result, Plaintiffs have suffered actual damages.

WHEREFORE, Plaintiffs respectfully request that this Court:

A. Enter a judgment in favor of Plaintiffs and against Defendants, jointly and severally, in an amount to be determined at trial, but in excess of Ten Million Dollars ($10,000,000), to compensate the Plaintiffs for any losses proximately caused by the Defendants' unjust enrichment to the extent such losses are reasonably capable of calculation;

B. Award punitive damages in favor of Plaintiffs and against Defendants in an amount of Twenty Million Dollars ($20,000,000).

C. Grant Plaintiffs the costs of this action, including reasonable attorneys' fees, and such other and further relief as this Court deems just and appropriate.

## COUNT VII
## CONSTRUCTIVE TRUST
## (ALL DEFENDANTS)

286.    The allegations of Paragraphs 1 through 225 incorporated herein by reference with the same force and effect as if set forth in full below.

287.    Defendants malicious and wrongful transfer of Signature Homes' assets through various schemes set forth above constitutes fraudulent and requires the imposition of a construct trust on Signature Homes' assets in the possession of the Defendants.

288.    The foregoing conduct of Defendants was malicious, performed with intent to injure Plaintiffs, and was without justification or privilege.

289.    As a direct and proximate result, Plaintiffs have suffered actual damages.

WHEREFORE, Plaintiffs respectfully request that this Court:

A. Enter an order establishing a constructive trust for all assets in Defendants' possession that were wrongfully taken from Signature Homes or improved by Signature Homes without fair compensation;

B.  Grant Plaintiffs the costs of this action, including reasonable attorneys' fees, and such other and further relief as this Court deems just and appropriate.

**COUNT VIII**
**ACCOUNTING**
**(ALL DEFENDANTS)**

290.    The allegations of Paragraph 1 through 225 are incorporated herein by reference and re-alleged with the same force and effect as if set forth in full below.

291.    Mr. Reece and ARR were responsible for the day-to-day management of Signature Homes.  The Disloyal Employees were responsible for managing the operation of Signature Homes and maintaining its books and records.

292.    Defendants have wrongfully siphoned cash, assets and business opportunities from Signature Homes.

293.    Defendants have cause erroneous accounting entries and other fraudulent transaction records to be included in the books and records of Signature Homes.

294.    The foregoing conduct of Defendants was malicious, performed with intent to injure Plaintiffs, and was without justification or privilege.

295.    As a direct and proximate result, Plaintiffs have suffered actual damages and the existing accounting records contain intentional errors.

296.    Defendants must fully and completely account for all cash and assets that have been transferred to them from Signature Homes.

WHEREFORE, Plaintiffs respectfully request that this Court:

A.    Enter an order that Defendants to fully and completely account for all sums due Plaintiffs and have a judgment against Defendants in the sum found to be due to Plaintiffs on such accounting, with interest together with costs and disbursements of this action, and further relief as this Court deems just and appropriate.

B.   Grant Plaintiffs the costs of this action, including reasonable attorneys' fees, and such other and further relief as this Court deems just and appropriate.

_____/s/_____
ANDREW RADDING
H. SCOTT JONES
Adelberg, Rudow, Dorf & Hendler, LLC
7 Saint Paul Street
Suite 600
Baltimore, MD  21202
410-539-5195

*Attorneys for Plaintiffs*

## <u>DEMAND FOR JURY TRIAL</u>

Now Come Plaintiffs Signature Homes, LLC and BG Realty, LLC ("Plaintiffs") by and through their attorneys, Andrew Radding, H. Scott Jones, and Adelberg, Rudow, Dorf & Hendler, LLC, and demand that this case be tried before a jury.

_____/s/_____
ANDREW RADDING
H. SCOTT JONES
Adelberg, Rudow, Dorf & Hendler, LLC
7 Saint Paul Street
Suite 600
Baltimore, MD  21202
410-539-5195

*Attorneys for Plaintiffs*
